Wesley v. Hepp is our next case for argument. Mr. Mullins. Thank you. Good morning. May it please the court. My name is Brian Mullins and I represent Johnny Wesley on this habeas corpus petition following a Wisconsin state conviction for felony murder. Mr. Wesley was arrested in connection with a homicide on February 5th of 2014 in Milwaukee. The following day police approached him about discussing the case, discussing the allegations and his response was I ain't making no statements about no murder. Police interpreted that response as an assertion of the right to remain silent and Wisconsin state courts have also interpreted that response as an assertion of the right to silence. The same day, about nine hours later, police approached Mr. Wesley again and again Mr. Wesley asserted his right to remain silent. We don't know the exact language that he used because we don't have a recording of that but there's no dispute that he asserted his right to remain silent. Neither time were Mr. Wesley read his Miranda rights. The following day at about 2.50 p.m. police attempted a third interview with Mr. Wesley. He was brought to an interrogation room and this time he was read his Miranda rights. During the course of that interview he made three statements that we believe were also assertions of his right to remain silent. Can I back up one step? One could imagine an argument that there needs to be an end to the number of times the police keep coming back to see if you'll change your mind about talking and let's assume that these are all more than the two hours that were at issue in Mosley. This was three. You could see a pestering or pressure tactic here but the problem with that argument I think is that there's no Supreme Court law. The Supreme Court itself has never said in so many words that once the police have tried twice they've just got to accept no for an answer. Once they've tried five times they have to accept no for an answer. So the police here were operating in a gray zone which is not ever good for a habeas petitioner. No, there is no clear line that the Supreme Court has said about the number of times police may reattempt to interview. However, Mosley does list the degree to which police pursued further interrogation once the suspect invoked the right to remain silent as a factor among the factors that courts should consider whether the right was scrupulously honored. And the Wisconsin courts do. I can see that the line that Wisconsin courts are drawing is between on the one side a statement to the effect of I do not wish to talk to you period. That's one. Or on the other side, I didn't do it, exculpatory statements. And the Wisconsin Court of Appeals sees all three of the statements that you're focusing on from the third interrogation as falling on the exculpatory side of the line and not being a clear enough Oxford Donish, if you will, statement that I really am telling you I don't want to talk to you. And we think that is the problem. They are requiring somebody to discriminate in the form of an Oxford Donish. But isn't that where the Supreme Court has taken this? They certainly have done that when it comes to the question whether you've invoked the right to counsel. There are all kinds of ambiguous things people say about counsel or maybe not even so ambiguous. And the court just says, well, that's not quite clear enough. That's not quite clear enough. So so why isn't this roughly the same? And I'd like to add the Supreme Court has said in cases like Anderson against Charles that if you say something like I don't do nothing, I sit in the house all day, I don't do nothing. That's an affirmative statement. It can be introduced in the prosecution's case in chief. It can be used for cross-examination. The justices themselves have said that that is not an invocation of silence, that that kind of statement is not silence. And we're not arguing that that statement in particular was an assertion. But that's the problem. If you have somebody who is making affirmative declarations of innocence, that's really inconsistent with invoking your right to silence. So the one I would like you to focus on, this is the one I find most troublesome, is when he finally says about an hour after the first couple of statements, can I go back to my cell now? I thought the Wisconsin Court of Appeals reading of that was pretty thin. And because can I go back to my cell now sounds like I don't want to talk to you anymore. It's just a different way of phrasing it. But on the other hand, the Wisconsin Court of Appeals, we're in the range of lunacy, right? Was the Wisconsin Court of Appeals completely off base when they said, well, this could have been part of the back and forth of a negotiation? Wesley clearly wants to know what do the police have on me? Is there a solid distinction between saying I'm just tired for the time being, but I'm not telling you I'll never talk to you again? It suggested a couple of other interpretations. And since there were other interpretations, they said that's not clear enough either. But I'd like your thoughts on that. Well, I think the police officer took it as meaning that he didn't want to talk to him anymore because he said, is that really going to help you? And I think that is significant because it goes to the what this court described as kind of the essence of the Miranda Mosley line of cases, which is to look at whether police sought to undermine the suspect's resolve to remain silent. So we have these factors, but they can't be applied woodenly. I think it's a totality of circumstances test. And that's really what the general issue is, is whether this police sought to undermine the suspect's resolve. There are other examples. After Miranda rights were read, Mr. Wesley said something to the effect of I'm not going to talk to you. And the officer said, as long as you're willing to talk to me, I think we're good. So, again, I think it's an attempt to undermine Mr. Wesley's resolve to remain silent, which in the context of two previous assertions of his rights remain silent and continued assertions during the third interview. I think when that context is taken into account, that's where the unreasonable application of Mosley and Miranda comes into play. I will reserve the rest of my time. Mm hmm. Certainly, Mr. Mullins. Vander Mews. Good morning. And may it please the court. I'd like to begin this morning by addressing judges. Woods question as to part of the Thompson's claim and the statement that was concerning to the court. Can I go back to my cell now? So as this court knows, under Davis and Tompkins, the test is a reasonable officer test. Would an officer understand the statements to be an unequivocal invocation of the right to remain silent? If so, then all questioning needs to cease. However, if under the circumstances, a reasonable officer would only have understood that the suspect might be invoking his right to silence. The officer is not required to stop questioning. That's right out of Davis. Yes, the court does say that. I have a lot of trouble imagining that any statement other than I wish to invoke my right to remain silent, period, or I am going to stop talking to you now about everything, including the weather, including, you know, the paint on the walls. I'm going to stop talking now. I mean, it seems. In the real world, quite unrealistic to ask people such as Mr. Wesley, you know, to be that precise, but that does seem to be what you're asking for. Respectfully, Judge, no, that's that's not what we're asking for. And there are statements such as and I think there are cases cited in the briefing, such as Green and others, where statements like I don't want to talk no more were made. This is different. The three statements at issue in this Tompkins claim are ain't nothing to talk about, though I ain't got shit to say about no homicide. And can I go back to myself? Now, as to the first two, a reasonable officer could interpret those as meaning I don't have anything to say because I didn't do it. Well, see, and this is an important point, because the reason you can say that about the first two isn't because of the statements you just read off. It's because if you look at what he said immediately before and after, he says exactly what you said both times. He says, you know, I'm not going to say anything about the homicide because I didn't do it. I'm not going to talk. So so this exculpatory statement. So that makes me ask, you know, how much of the context of what he's saying is properly considered? I think that the context is is helpful, especially what is leading up to the statement at issue. So let me take that third statement. Can I go back to myself now? If you look in the court of appeals decision, they did excerpt some of the transcript or the excerpted discussion. And what we see before that statement is an exchange between Wesley and Detective Corbett saying basically Wesley is trying to figure out what Detective Corbett knows. He says things like, you're telling me for sure, you know, I was with dude. And Detective Corbett says, yep. And then Wesley says, well, what did Lloyd say? And so there's this kind of banter back and forth. And Detective Corbett said, well, I don't want to tell you that. I just want your side of the story. And then Wesley says, well, if you know for sure I shot him, what's the point of sitting here? And then there is a period of silence. Oh, actually, no, let me back up there. We didn't quite get to the silence yet. Yes, chips and water. And then there's a period of silence. And after that, he says, can I go back to myself? So, OK, there are multiple reasonable interpretations of that statement in light of the context. One of them is, yes, he could have been saying, I'd like to go back to myself. I don't want to talk anymore. He didn't say that. But he didn't say that. He didn't say I want to go back to myself. Right. And another reasonable. He said, can I go back to myself? Can I go back to myself? Another reasonable interpretation is, is this over? Are we done here? Are you not going to give me any more information? Can I go back now? That's correct. Or another one is kind of what the Court of Appeals landed on, which is he's just engaging in a dialogue with them, trying to figure out what they know. They're trying to figure out what he knows. So, again, because this is habeas review, we are under the standards of ADPA. We have to decide whether there was a clear violation of clearly established federal law when the Court of Appeals applied this test. And here there absolutely was not. So I haven't spoken about the Mosley claim yet. And I'd like to touch on that before my time expires. So as this court knows, the Mosley court set forth factors, non-exhaustive, not to be rigidly applied to help guide the decision as to whether under the totality of the circumstances, the officers scrupulously honored a suspect's right to cut off questioning. Now, with that standard in mind, looking at what the Court of Appeals did in this case, the court methodically went through those factors and came to a reasonable conclusion that the officers did not improperly coerce Wesley into answering questions. So the court made four observations. First, the officers promptly terminated both the first and the second interview when they understood Wesley to be saying that he didn't want to talk anymore. Second, a set of different officers, Detective Dalland and Corbett, were the ones who resumed questioning during that third interview. Third, a significant period of time lapsed between the first and the second interview as well as the second and the third interview. I think it was nine hours between the first two, 17 hours between the second two. And fourth, the subject matter of the discussed crime was the same. Now, that's different from Mosley because the Mosley court observed with approval that the subject matter was different, but as we know from this court's decisions, that's not a dispositive observation to make. I think the Schwenzow decision was this court's decision to say that that is not a dispositive factor. Well, nothing is dispositive. Correct. It's totality of the circumstances. So under the totality of the circumstances, the court reached a reasonable decision here. I'd like to respond briefly to what I understand Mr. Wesley to be arguing with respect to kind of looking at the language of the first interview as well as the third interview because I think there was an argument that Detective Dalland, who was present at both interviews, might have, you know, because he was there at both, would have understood Mr. Wesley to be invoking his right to silence in the third. But we have to remember that the language used, that Mr. Wesley used during the first interview, was actually quite different. I mean, Detective Spano said that she wanted to talk to him, but they needed to first have an understanding as to whether he'd be willing to chat. And then he said, hell no, because I ain't killed nobody. He said, no. And she said, okay, so you don't want to talk to us about it. And he said, not about no murder, no. So, like, that actually contextually is very different than what we have in the third interview, which is just him saying, ain't nothing to talk about, and I ain't got no shit to say. Again, reasonably, the court could conclude that those are exculpatory statements. So I think just kind of tying it all up, under AEDPA, the question is whether the court reasonably applied a clearly established federal law when it decided both that Mr. Wesley's right to silence was scrupulously honored, and whether Mr. Wesley clearly invoked his right to silence during the third interview. The Court of Appeals decision was reasonable, and we're asking this court to affirm the district court's denial of Wesley's habeas petition. Thank you. Thank you, counsel. Anything further, Mr. Mullins? Yes. Just getting back to those first and third interviews, the line in the first interview was, I ain't making no statements about no murder. In the third interview was, I ain't got shit to say about no homicide. I find that to be materially indistinguishable. And just two points that we believe also show that the state court decision was not just wrong but unreasonable was that we believe that they manufactured ambiguity by analyzing the motivation behind Mr. Wesley's statement without just focusing on the plain meaning of what he was saying. The plain meaning was that he didn't want to talk to the police. The motivation behind it might be ambiguous. I thought the plain meaning was he didn't want to talk to the police about the murder. But that was the only thing he wanted to talk about. He wanted to talk to them about the robbery. There was no robbery at issue, really. The homicide was what they were focusing on. I don't believe there was another crime that was being discussed. Well, but there was in the background because of the desire to steal the marijuana, as I recall. That's how the whole thing – that's why the felony murder, you know. Indeed. Police were investigating homicide. And that was the focus of their investigation. It resulted from the botched robbery, yeah. Correct. And any ambiguity must be construed in the suspect's favor. That's from Connecticut v. Barrett, a Supreme Court case. We do not believe that the Wisconsin Court of Appeals applied that holding. Thank you. Nothing further? Thank you, counsel. The case is taken under advisement.